(634 P.2d 144)

No. 52,507

STATE OF KANSAS, *Appellee,* v. FLOYD CALVIN PUCKETT, *Appellant.*

Opinion filed August 28, 1981.

*Marjorie Wholey Haines,* of Hylton & Fletcher, P.A., of Wichita, for appellant.

*R. Michael Jennings,* assistant district attorney; *Clark V. Owens,* district attorney; and *Robert T. Stephan,* attorney general, for appellee.

Before SPENCER, P.J., REES and MEYER, JJ.

MEYER, J.: Defendant Floyd Calvin Puckett was convicted of seven counts of selling unregistered securities (K.S.A. 17-1255 and 1979 Supp. 17-1267), seven counts of failure to register as a broker-dealer or agent (K.S.A. 1979 Supp. 17-1254 and 1979 Supp. 17-1267), and seven counts of unlawful acts in connection with the sale of a security (K.S.A. 1979 Supp. 17-1253 and 1979 Supp. 17-1267) [referred to interchangeably as failure to disclose a material fact or the "fraud" counts]. The securities involved are fractional interests in oil and gas leases. Defendant Puckett appeals from his conviction.

The circumstances which gave rise to the convictions began in July, 1977, when Robert R. Freeman, an attorney, and Toby Elster approached defendant regarding an oil lease, known as the Parker lease, which they had obtained in Red Willow County, Nebraska. After discussion among the three men, the details of an

agreement regarding the transfer of the lease to defendant and to his corporation, Petroleum Producers, Inc., were finalized. The parties agreed that Freeman and Elster would retain a 25 percent carried interest (said 25 percent was later purchased by Arthur J. Gorski) in the oil produced in exchange for transferring the lease to defendant. Defendant also assigned to his wife a 25 percent carried interest. Defendant planned to drill two wells on the leased acreage by the beginning of 1978.

Defendant met with his salesmen in August, 1977, and acquainted them with the lease which they were to sell to potential investors. Between September, 1977, and January 10, 1978, eight investors were sold interests in the leases. None were told about the carried interests.

On October 27, 1978, defendant wrote a letter to three of the purchasers on his corporate stationery verbalizing what he had known all along:

"I told you during my presentation that the purchase price of the first two wells was double high, so to speak, due to the fact that in order for me to acquire the acreage I had to carry one-quarter of the working interest free on the drilling, equipping, and completion in addition to the normal quarter interest for the promoter-producer. In other words that party paid nothing, which made the purchase price very high, however, due to the location of the acreage involved and with the potential of getting producers rather than dry holes, I felt it was worth it."

Gary Burge, one of the salesmen, testified that one of the investors requested information about the drilling dates, which request he referred to defendant. Defendant told Burge to make a copy of a portion of a letter showing the drilling dates, but told him to cover up the portion of the letter regarding the acquisition of the Red Willow lease by giving a carried interest.

All of the investors testified that the existence of the carried interests was important knowledge to them because if they had known that there were carried interests they would not have invested. Frank Morgan, an expert witness for the State, testified that it is important to know about the existence of carried interests because "it would tell you what you might expect in the way of return, how long it would take you to get your return of your investment capital, not profit, just return of the investment capital. . . . Would make a big difference." Morgan's testimony was also corroborated by Bruce Burditt, chief accountant in the office of the Kansas Securities Commissioner.

Defendant first contends that the trial court erred in failing to

grant a motion to dismiss at the close of the State's evidence since there was no evidence to show materiality of the fact not disclosed.

The scope of review in a criminal case is found in *State v. Peoples,* 227 Kan. 127, 133, 605 P.2d 135 (1980):

"In a criminal action where the defendant contends the evidence at trial was insufficient to sustain a conviction, the standard of review on appeal is: Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found defendant guilty beyond a reasonable doubt? [Citations omitted.] In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict, it does not weigh the evidence and if the essential elements of the charge are sustained by any competent evidence the conviction must stand. [Citation omitted.]"

K.S.A. 22-3419(1) states:

"The court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more crimes charged in the complaint, indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such crime or crimes. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without having reserved the right."

In *State v. Colbert,* 221 Kan. 203, Syl. ¶ 4, 557 P.2d 1235 (1976), it is stated:

"A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If the judge concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion."

See also *State v. Tillery,* 227 Kan. 342, 345, 606 P.2d 1031 (1980).

Our question, then, is whether there was evidence from which a juror might conclude beyond a reasonable doubt that the failure to disclose the fact that there was a 25 percent carried interest given to obtain the lease in addition to defendant's wife's 25 percent carried interest was material, *i.e.,* was there a substantial likelihood that a reasonable investor would consider such carried interests important in deciding whether to purchase securities.

It is necessary in order to understand this case that the reader understand what is meant by "carried interests." Such interests,

in this case, were interests to be carried free to the persons who have such interests to the point when the well would begin to pump. That is, the holders of the carried interests would not need to help with production expense insofar as drilling the well, inserting the pipes and installing the pump were concerned. The expenses to that point would be paid by the producer or others.

Defendant's argument on this issue goes only to the counts relating to failure to disclose a material fact in connection with the sale of a security. The other counts were not argued in terms of sufficiency of the evidence. Defendant argues that there was insufficient evidence to show that the fact that was not disclosed was "material." The state points to evidence that (1) there was an admission by defendant that investors paid a higher price because of the carried interests (see portion of October 27, 1978, letter set out above); (2) there was expert testimony stating that the carried interests affected the length of time within which the investors would recoup their investments; and (3) the additional cost in having carried interests was borne by the paying investors.

Defendant claims that the 25 percent carried interest given for the lease was not a material fact that needed to be disclosed because (1) some consideration had to be given for the lease; (2) the price for each share of the working interest was not directly related to the cost of drilling and completing the wells; and (3) that the other 25 percent carried interest (that he assigned to his wife) is customarily retained by a promoter-producer. Defendant explains his first argument in the following terms:

"If for example, defendant had paid $100,000.00 to acquire the lease, then each share of the working interest sold would have had to pay a proportionate share of the $100,000.00 in addition to a share of the other expenses."

Thus, there is no way of telling whether the 50 percent carried interests would have caused the price paid for a share to be more or less than if the carried interests had not been used. This argument merely is contradictory to defendant's admission that the price paid was higher than it would have been if there had not been carried interests. This argument tends to go to the weight to be given such evidence and was for the jury to decide.

Defendant argues secondly that since the price per 1/16 share at $30,000 was set on a turnkey basis, the total cost of developing the wells was set and the price for each investor was not subject to increase. If the cost of development went over what defendant

estimated the cost would be, defendant would have to absorb the loss. This argument has some merit because the investor would know at the time of purchasing a share in the working interest exactly how much would be paid for the interest. The fact that said purchase price was "double high" would not necessarily be material in that each investor knew exactly what the cost of the share was.

The State's expert witnesses testified that the length of time to recoup the investment was extended because of the carried interests. The witnesses compared the percent of actual drilling cost to the percent of net income to be received. While defendant argues that the State failed to take into account the acquisition cost, the fixed price paid by the investor, the investment of defendant in the drilling cost, and the possibility that drilling costs may have been much greater, this type of argument tends to go toward the weight to be given the State's testimony, and is for the jury to determine.

While defendant's arguments have some merit, it was within the trial court's discretionary power to leave these questions to the jury. Defendant was able to present his mitigating evidence to the jury and argue it, and while admittedly the area is complicated and the jury may have made a mistake, it would be their prerogative to believe the State's witnesses over defendant's witnesses.

In addition, the jury would have considered the investors' statements that the fact that there were carried interests was material to them and they would not have invested in this property had they known that there were carried interests.

Defendant next claims that Instruction No. 46 was erroneous.

Defendant did not object to Instruction No. 46, and therefore our standard of review is whether the instruction given is *clearly* erroneous. See K.S.A. 22-3414(3).

Instruction No. 46 states: "A fact is material if a reasonable person would consider it important in making an important decision."

The test in federal securities fraud cases as to whether there is a material fact is that there must be shown "a substantial likelihood that a reasonable shareholder would consider it important . . . ." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 439, 48 L.Ed.2d 757, 96 S.Ct. 2126 (1976); *Hassig v. Pearson*, 565 F.2d 644, 650, (10th Cir. 1977).

The difference in the two instructions is the concept that there must be a substantial likelihood that a reasonable shareholder would consider it important rather than the fact that a reasonable person would consider it important. The instruction used in the instant case is stronger than the one cited in the federal securities fraud cases because the one used in this case requires that a reasonable person *would* consider it important, whereas the federal rule only requires a *substantial likelihood* that a reasonable shareholder would consider it important. Instruction No. 46 was not clearly erroneous.

Defendant contends the court abused its discretion in limiting cross-examination of the expert witnesses.

The trial court held that defendant could not cross-examine the State's expert witnesses as to "turnkey" projects because such questions were beyond the scope of direct examination.

Cross-examination must be responsive to testimony given on direct and must be material and relevant. *State v. Nirschl,* 208 Kan. 111, Syl. ¶ 5, 490 P.2d 917 (1971). Cross-examination of an expert should be permitted to the fullest extent so the jury may determine the probative value of his testimony. *Rostine v. City of Hutchinson,* 219 Kan. 320, Syl. ¶ 7, 548 P.2d 756 (1976). The extent of cross-examination lies within the sound discretion of the court. *State v. Guffey,* 205 Kan. 9, 17, 468 P.2d 254 (1970). Where general subject matter has been opened up on direct, cross-examination may go to any phase of the subject matter and is not restricted to identical details developed or specific facts gone into on the direct. *Frame, Administrator v. Bauman,* 202 Kan. 461, 465, 449 P.2d 525 (1969).

The knowledge as to what the carried interests in this case were, is essential to the trier of fact because it is defendant's contention that it is of no concern to the investors as to who would pay for the drilling of the well, for the pump, for its installation, etc.; any deficiency, or overrun of costs, would have to be paid by the producer anyway. That is, defendant contends that the producer himself would have to pay all production expenses. He bolsters this contention by testimony of his expert witness plus his assertion that the investors have no reason to be concerned about who pays expenses since they know that they will receive a certain percent of the well's net proceeds or a

specific number of dollars, and that it is immaterial to the investors whether all of their money, or only part of it, is utilized by the producer to produce oil.

On the other hand, with equal sincerity, the prosecution contends that had the investors known that the producer was receiving no money from others than themselves to produce the wells in question, that they ostensibly would have been in a better bargaining position when they purchased their various interests. Indeed, the testimony of the investors was that such knowledge would have made a difference to them in making their investments. Moreover, the State presented expert testimony to the effect the nondisclosure was material.

Both of the above arguments appear tenable. It can be seen that the jury might well have decided to adopt either of the above views; hence, the question of materiality of the withheld information (*i.e.,* the carried interest) was of extreme importance.

We have no trouble in concluding that the question as to whether the withheld information was material was properly left to the trier of fact—in this case the jury. Normally, also, we would be persuaded, since there was considerable evidence going in each direction—that is, that the facts withheld were material vis-a-vis that they were not—that the jury verdict should be upheld. However, we believe that full cross-examination might have more fully informed the jury, and we are unable to say that such cross-examination would not have changed the jury's decision. Therefore, the error was not harmless. We conclude that as to the seven fraud counts, which involved materiality, that defendant should be afforded a new trial.

Defendant contends the trial court erred in excluding testimony of the Kansas Securities Commission's nonenforcement policy as relevant to the issue of defendant's intent to defraud.

Defendant claims that the nonenforcement policy was equivalent to an order. It should first be noticed that there was no proffer of the specific evidence which allegedly would have proved that the Kansas Securities Commission had a policy of nonenforcement in regard to oil and gas leases.

K.S.A. 60-405 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or

indicated the substance of the expected evidence by questions indicating the desired answers."

While we know what defendant intended to prove, we do not know what evidence he had to support his allegation.

As to defendant's argument that the nonenforcement policy was equivalent to an order, it is noted that the cases which defendant cites (*Environmental Defense Fund, Incorporated v. Hardin,* 428 F.2d 1093 [D.C. Cir. 1970]; and *Nader v. Saxbe,* 497 F.2d 676 [D.C. Cir. 1974]) do not stand for the defendant's proposition that a nonenforcement policy is a defense to a criminal prosecution. Those cases merely held that an administrative policy of nonenforcement was an agency order *for purposes of judicial review.* This would permit a private attorney general concept where a person could come in and get judicial review of the fact that there was nonenforcement. This does not rise to the level of defense to a criminal action.

As to the argument that the district attorney was estopped from prosecuting by the nonenforcement policy, we note in *Derby Oil Co. v. City of Oxford,* 134 Kan. 59, 4 P.2d 435 (1931), it was held that a mayor's promise not to prosecute an oil company for drilling while validity of the ordinance was being tested, and counsel's conduct, estopped the city from prosecuting. However, we question whether the actions of the Kansas Securities Commission could estop a district attorney from prosecuting. While the violations are controlled by the same act, it is noted that K.S.A. 1979 Supp. 17-1267(*b*) states:

"The commissioner may refer such evidence as may be available concerning violations of this act or of any rule and regulation or order hereunder to the attorney general *or the proper county or district attorney, who may in the prosecutor's discretion, with or without such a reference, institute the* appropriate criminal proceedings under this act." (Emphasis added.)

In addition, it is noted that while the *Derby Oil Co.* case involved an express promise, defendant in the case at bar is relying on a nonexpress "policy" of the Kansas Securities Commission. Defendant cites several cases from other jurisdictions. In *Oil Shale Corporation v. Morton,* 370 F. Supp. 108 (D. Colo. 1973), an administrator was estopped by an announced policy of the department regarding the effective nonperformance of assessment work. It is noted that the *Oil Shale* case involved an announced policy whereas in the case at bar there is nothing so

concrete. Defendant also cites *Khoury v. Board of Liquor Control,* 81 N.E.2d 634 (Ohio App. 1948). In that case several members of the Board of Liquor Control visited the accused's establishment but lodged no protest against strip-tease shows. The license could be revoked on "sufficient cause." The case turned not on whether the city was estopped from prosecuting, but on what constituted sufficient cause. We are not dealing with a violation based on such a nebulous concept.

Defendant's assertion that the failure to enforce the Securities Acts provisions in the oil and gas industry constitutes an order, then, is not supported by law. Therefore, defendant cannot rely on the fact that he was "complying with an order of the commissioner." See K.S.A. 1979 Supp. 17-1270(*f*). Furthermore, defendant's reliance on K.S.A. 1979 Supp. 17-1267(*a*) is misplaced. That statute provides that no person may be *imprisoned* for the violation of any rule or order if he proves that he had no knowledge of the rule or order. The statute relates only to imprisonment and not to the issue of criminal intent.

We conclude it was not error for the court to exclude testimony regarding the Kansas Securities Commission's nonenforcement policy from the jury. Such evidence was not relevant to the issue of defendant's intent to defraud.

Defendant next contends the trial court erred in not allowing testimony that defendant's attorney had advised him that he could sell the interests in the oil and gas lease without registering with the Kansas Securities Commission.

Good faith is a defense. Good faith reliance on the advice of counsel is a factor to be considered by the jury in determining whether there was an intent to defraud. *People v. Terranova,* 38 Colo. App. 476, 563 P.2d 363 (1976). See also *U.S. v. Piepgrass,* 425 F.2d 194 (9th Cir. 1970).

Defendant misstates what the holding of the trial court was. The trial court held:

"[T]hat Mr. Freeman did not give any legal advice to PPI or to the defendant Puckett until early December of 1977, and that was *on a specific sale to kin folk* of Mr. Puckett in which he advised him that he could make the sale, that that particular sale was exempt; that had the defendant been charged with that sale, it would be the intention of the Court to allow the testimony of the—he relied upon the advice of his attorney to go to the jury as one of the factors of consideration in removing the necessary intent element or scienter that is found in the fraudulent sale of securities, that being not an absolute defense but merely one of the things

that the jury should consider. However, the next sale—*the next conversation that Mr. Freeman has with Mr. Puckett concerning a sale in Red Willow County, Nebraska, is in late January or early February, and all of the sales that the defendant has been charged with in this instant case have already been consummated.* They have already been completed and transacted and, therefore, the defendant would not have the right to rely upon the—not an absolute defense, but the defense that I relied on the advice of my attorney because the sales had already been consummated." (Emphasis added.)

Defendant states that the trial court's reason for not accepting evidence concerning legal advice was that the attorney was not actually retained as counsel at the time the advice was given. This was a misstatement of the reason that the court gave for excluding the evidence. Clearly, if the advice in question was given after the sales had already been made, they could not vitiate defendant's intent to defraud. The intent of defendant is relevant at the time the contracts were entered into.

Defendant also contends the trial court erred in instructing with Instruction Nos. 48, 53 and 56.

Instruction No. 48 states:

"In order for you to find any defendant guilty of Counts 3, 9, 12, 15, 18, 21 and 24, you must find that the defendant intended to deceive, manipulate or defraud by the acts set out in Instructions 7, 8, 13, 14, 19, 20, 25, 26, 31, 32, 37, 38, 43, 44."

Instruction No. 53 states:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the state has met the burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

Instruction No. 56 states:

"The intent with which an act is committed, being but the mental state of the person committing it, direct proof of such intent is not required, but it may be proved by any competent evidence, direct or circumstantial. Such intent, however, must be established by the weight of evidence required by these instructions."

As to Instruction No. 48, defendant objected to the instruction as given because the following was deleted: "You must find that the defendants acted with a design, purpose or intent to do wrong or cause an injury to another."

First, it is noted that as to the sale of unregistered securities, a specific intent is not required. It was held in *State v. Hodge,* 204 Kan. 98, 107, 460 P.2d 596 (1969), a case involving sale of

unregistered securities and sale by persons not registered as brokers/dealers:

"No specific intent is necessary to constitute the offense where one violates the securities act except the intent to do the act denounced by the statute."

The term "willfully" under K.S.A. 1979 Supp. 17-1267 is construed to mean that the person acted intentionally in the sense that he was aware of what he was doing. 204 Kan. at 107-8.

The cases under the Securities Act of 1933, 15 U.S.C. § 77e, regarding sale of unregistered securities are split as to whether scienter is an element of the offense.

Compare *United States v. Crosby,* 294 F.2d 928 (2nd Cir. 1961), *cert. denied* 368 U.S. 984 (1962); and *United States v. Tortorello,* 480 F.2d 764 (2nd Cir.), *cert. denied* 414 U.S. 866 (1973); with *United States v. Custer Channel Wing Corporation,* 376 F.2d 675 (4th Cir.), *cert. denied* 389 U.S. 850 (1967); and *United States v. Sussman,* 37 F. Supp. 294 (E.D. Pa. 1941).

On the other hand, under the federal securities laws, it has been held that an action for violation of Rule 10b-5 under the Federal Securities Exchange Act of 1934 does involve a requirement of scienter. Rule 10b-5 makes it unlawful to omit to state a material fact in connection with the purchase or sale of any security. It was held in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 47 L.Ed.2d 668, 96 S.Ct. 1375 (1976), that a private cause of action for damages will not lie under section 10(b) and Rule 10b-5 in the absence of any allegation of "scienter," *i.e.,* an intent to deceive, manipulate or defraud on the defendant's part. 425 U.S. 185.

The court in the case at bar followed the *Ernst* decision and required the jury to find an intent to defraud on the part of the defendant on the counts dealing with failure to disclose a material fact. The court followed *State v. Hodge,* 204 Kan. 98, with regard to the other two violations.

As to Instruction No. 53, it is noted the court used the revised PIK Crim. 54.01. This revised instruction meets the requirements of *State v. Acheson,* 3 Kan. App. 2d 705, 601 P.2d 375, *rev. denied* 227 Kan. 927 (1979), which criticized the old instruction in view of *Sandstrom v. Montana,* 442 U.S. 510, 61 L.Ed.2d 39, 99 S.Ct. 2450 (1979). The new instruction makes it crystal clear that the burden of proof with regard to intent is not shifted.

As to Instruction No. 56, the instruction specifies that the intent must be established by the weight of evidence required by these

instructions. Such sentence refers the jury back to the fact that it must prove intent beyond a reasonable doubt. The trial court did not err in using these instructions.

Defendant contends the trial court erred in limiting cross-examination of witness Burge.

Defendant argues that he was prevented from impeaching Burge's testimony that he didn't know anything about selling oil and gas leases, except what defendant had told him. Burge also testified that he didn't know what a carried interest was. When the defendant attempted to cross-examine Burge regarding previous sales of oil and gas leases, the attorneys went into chambers to discuss an objection that said questions were outside the scope of direct examination. In concluding that such testimony went beyond the scope of direct, the court prevented defendant from establishing that it was Burge's custom not to reveal carried interest. The court, however, stated that the ruling was not meant to block defendant from impeaching Burge's testimony, and that he could do anything and everything that he felt he needed to do to bring that out. Furthermore, the court allowed defendant, in his case in chief, to establish that by the time the Parker lease was entered into, Burge had worked on three other leases and had made sales to numerous investors. Considering all this, the limitation of cross-examination of Burge cannot be ruled to be an abuse of discretion.

Additionally, the fraud instructions concern us. These instructions were Instruction Nos. 7, 13, 19, 25, 31, 37, and 43. Since all of the fraud instructions are identical, except for the name of the person allegedly defrauded, we will set out herein only Instruction No. 7, which in its entirety reads as follows:

"The defendant Floyd C. Puckett is charged in Count Three with the crime of unlawful acts in connection with the sale of a security. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant Floyd C. Puckett directly or indirectly did employ or devise, scheme or artifice to defraud, to-wit:

That one Arthur J. Gorski would hold a carried interest of 25% in each of the two wells to be drilled on the Red Willow County, Nebraska, lease, and that Doris M. Puckett would hold a carried interest of 25% in each of the two wells to be drilled on the Red Willow County, Nebraska, lease;

"2. That the same was employed willfully, knowingly, and intentionally;

"3. That the same was employed in connection with the sale or offer to sell a security to Gordon L. Baldwin;

"4. That said acts occurred within Sedgwick County, Kansas, on or about the 15th day of September, 1977.

*OR*

"1. That the defendant Floyd C. Puckett directly or indirectly did fail or omit to state a material fact necessary to make the statement made, in the light of the circumstances under which they are made, not misleading, to-wit:

That one Arthur J. Gorski would hold a carried interest of 25% in each of the two wells to be drilled on the Red Willow County, Nebraska, lease, and that Doris M. Puckett would hold a carried interest of 25% in each of the two wells to be drilled on the Red Willow County, Nebraska, lease;

"2. That the same was employed willfully, knowingly, and intentionally;

"3. That the same was employed in connection with the sale or offer to sell a security to Gordon L. Baldwin;

"4. That said acts occurred within Sedgwick County, Kansas, on or about the 15th day of September, 1977.

*OR*

"1. That the defendant Floyd C. Puckett directly or indirectly did engage in an act, practice or course of business which operated or could operate as a fraud or deceit upon any person by failing or omitting to state a material fact; to-wit:

That one Arthur J. Gorski would hold a carried interest of 25% in each of the two wells to be drilled on the Red Willow County, Nebraska, lease, and that Doris M. Puckett would hold a carried interest of 25% in each of the two wells to be drilled on the Red Willow County, Nebraska, lease;

"2. That the same was employed willfully, knowingly, and intentionally;

"3. That the same was employed in connection with the sale or offer to sell a security to Gordon L. Baldwin;

"4. That said acts occurred within Sedgwick County, Kansas, on or about the 15th day of September, 1977."

The problem with the fraud instructions, exemplified by number 7, involves the first paragraph of each of the alternative portions of the instruction. Obviously, since this instruction was in the alternative, the jury could have found the defendant guilty on the first portion, or the second portion or the final portion of those instructions. That portion of the instruction preceding the first "OR" is faulty for the following specific reason. Such instruction means to us that the jury was told that if it found the defendant did not reveal the facts of the carried interests that he was guilty of a scheme to defraud the investors. This would violate the right of the defendant to have the jury find that even though there was a failure to reveal the fact of the carried interests, such failure was not part of a scheme to defraud. Similarly under alternatives two and three of the instructions, the first paragraphs also instruct the jury that if they found that the defendant did not reveal the facts of the carried interests that defendant was guilty of failure to disclose a material fact. The

hotly contested issue in this case was whether the failure to disclose the fact of the carried interests was a failure to disclose a *material* fact. The trial judge specifically held that in view of the disputed evidence whether a carried interest was material was an issue for the jury. Yet the instructions take the issue of materiality from the jury and leave them only the issue of whether the defendant failed to disclose the carried interests. The jury was thus allowed to convict the defendant of a crime in the total absence of a finding of one of the necessary elements of the crime charged, *i.e.*, materiality.

Whenever an appellate court discovers an error in the jury instructions, which error is so extreme as to present a high likelihood that defendant's constitutional rights to a fair trial are involved, it has both the right and the duty to remand the case for new trial. This is so even if the matter was not objected to by defendant in the court below, nor presented in his brief on appeal, nor raised in oral argument before the appellate court. In the final analysis, it is up to the appellate court to feel assured that the defendant, particularly in a criminal case, has received a fair trial. Such rule should not come into play unless the appellate court is of the opinion that the jury might well have convicted the defendant of a crime which he may not have committed, and that such result might not have occurred had proper instructions been given.

Since we are unable to say that the jury would have convicted the defendant in the absence of the offending portion of the fraud instructions, it follows that those instructions are error, and that such error is of constitutional gravity.

Generally, failure to brief an issue constitutes a waiver or abandonment of a claim of error with regard to that issue. See *Friends University v. W. R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 (1980).

In the case at bar, there was no objection to the instruction at the trial court level, nor was the issue of whether the instruction was error briefed or argued on appeal.

The mere fact that there was no objection to the instruction at the trial level does not preclude review if the instruction is clearly erroneous.

K.S.A. 22-3414(3) states in part:

"No party may assign as error the giving or failure to give an instruction unless

he objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he objects and the grounds of his objection *unless the instruction is clearly erroneous."* (Emphasis added.)

In *State v. Stafford,* 223 Kan. 62, 65, 573 P.2d 970 (1977), it is stated:

"An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict."

Furthermore, issues not raised at the trial level can be reviewed under certain circumstances even though not considered by the trial court.

"As a general rule, a reviewing court will consider only those issues on which the parties have relied in trying their case, but exceptions exist where the newly asserted issue involves only a legal question arising on proved or admitted facts which will be finally determinative of the case, or where consideration is necessary to serve the ends of justice or to prevent a denial of fundamental rights." *Pierce v. Board of County Commissioners,* 200 Kan. 74, Syl. ¶ 3, 434 P.2d 858 (1967); *Holmquist v. D-V, Inc.,* 1 Kan. App. 2d 291, 299, 563 P.2d 1112 (1977).

Prior to January, 1977, there was a special rule in Kansas which stated in part:

"[N]o issue, other than an issue going to the jurisdiction of the court over the subject matter of the litigation, may be briefed or will be considered on the appeal unless included in the statement of points." Rule No. 6(d) (214 Kan. xxiii). See also *State v. Johnson,* 219 Kan. 847, 549 P.2d 1370 (1976).

Effective January 10, 1977, the former Rules of Appellate Practice, numbers 1 through 18 were repealed and new rules of appellate procedure adopted (220 Kan. xxix). The new rules contained no comparable statement. However, as noted above, when the briefs did not raise an error such errors were not considered even after elimination of the court rule.

We find no Kansas cases which recognize an error not raised on appeal other than the inferences which might well be drawn from the Kansas cases cited above. However, it is noted that other jurisdictions have recognized grave trial errors even though said errors were not raised in the briefs. Some have done so under specific rules of court which allow them to recognize "plain error," while others have done so in the interest of justice.

In *Knihal v. State,* 150 Neb. 771, 36 N.W.2d 109 (1949), the court reviewed an instruction even where said instruction was not assigned as error by defendant in his brief. The instruction was in

a criminal case and infringed upon the right of a jury to judge the credibility of witnesses and to give weight to their testimony. Said instruction was held to be an abridgement of the substantial right of the defendant. It is noted that in Nebraska, under a special rule of court, an appellate court was allowed to recognize plain error.

In *State v. Cutshaw,* 7 Ariz. App. 210, 437 P.2d 962 (1968), it was held that it was immaterial whether a fundamental defect was raised by defendant's brief or by the Court of Appeals, sua sponte. The error was considered even though not raised on appeal. It is noted the error was raised below. Because of a faulty information, the particular defect was that the defense had no way of knowing what the issues were.

In *Davis v. State,* 276 So. 2d 846 (Fla. Dist. Ct. App. 1973), though a point was not raised by defendant in his brief, the court of appeals recognized an obvious error in admitting evidence of another offense. It was therein stated:

"[P]atently invalid convictions ought not be affirmed on the basis of technicalities which cannot in the end thwart effective appellate review once the appellant gets the due process to which he is entitled." 276 So. 2d at 849.

In *People v. Hendrickson,* 11 Ill. App. 3d 219, 296 N.E.2d 751 (1973), the court considered an error which was clear from the record under a rule of court which allowed them to recognize plain error.

In *People v. McCollough,* 8 Ill. App. 3d 963, 291 N.E.2d 505 (1972), the question of the constitutionality of a statute was considered even though not raised in the court below nor on appeal. That state had a rule of court which allowed them to recognize plain error.

In *Boyd v. State,* 204 So. 2d 165 (Miss. 1967), an unlawful search and seizure was considered although the issue was not briefed on appeal.

In *Tatum v. State,* 534 S.W.2d 678 (Tex. Crim. 1976), the question of double jeopardy which was not raised in appellant's brief was considered because said issue involved both a violation of state and federal constitution and required review in the interest of justice.

In *Henson v. State,* 530 S.W.2d 584 (Tex. Crim. 1975), the clear violation of a statute regarding preparation time for counsel could be reviewed even though not raised by the briefs.

In *State v. Smith,* 11 Wash. App. 216, 521 P.2d 1197 (1974), an instruction which was assigned as error but was not set forth in the brief was reviewed. The court stated:

"Ordinarily, failure to set forth a challenged instruction in the brief will prevent review, as will failure to present the grounds relied upon to the trial court. However, instructions which allegedly violate a constitutional right 'will be reviewed even though error was not properly claimed or preserved.' [Citation omitted.]" 11 Wash. App. 224, citing from *State v. Williams,* 4 Wash. App. 411, 413, 481 P.2d 918 (1971).

From what has been said, it follows that the convictions for fraud contained in Counts 3, 9, 12, 15, 18, 21, and 24, must be reversed and remanded to the trial court for new trial on those counts. What we consider to be an undue restriction on cross-examination of the expert witnesses relative to materiality, coupled with the error in instructions mentioned above, are the reasons for such reversal and remand. We conclude, however, that such reasons do not extend to the other counts of which defendant was convicted. Therefore, the trial court is affirmed as to the seven counts of selling unregistered securities and the seven counts of failure to register as a broker/dealer of which defendant was convicted.

Affirmed in part; reversed in part and remanded to the trial court for further proceedings in line with this opinion.

REES, J.: Concurring.

The twenty-one convictions before us are for the sale of an unregistered security (K.S.A. 17-1255), failing to register as a broker-dealer or agent (K.S.A. 1980 Supp. 17-1254[a]), and an unlawful act in connection with the sale of a security (K.S.A. 1980 Supp. 17-1253[a]), arising out of each of seven sales. The K.S.A. 1980 Supp. 17-1253(a) convictions, the "fraud" convictions, are the real subject of this appeal.

When the sales were made, Puckett was obligated to effect an assignment of a carried interest of 25% of the "working interest" and an identical interest was to be reserved to Puckett. In the sales negotiations, the purchasers were informed of the location of the acreage, flooding operations taking place on or planned for adjacent and nearby acreage, and the price asked of the purchaser. There is no substantial evidence of other statements made to the purchasers. The purchasers were not told of the carried interests. Each sale was made on a turnkey basis. Payment of the agreed

purchase price constituted the purchaser's contribution toward the drilling, completion and equipping costs. The purchaser would owe nothing to and was entitled to no repayment from the operator no matter what the total amount of those costs might be. Upon production, the purchaser was liable for payment of his proportionate share of the operating costs.

At the heart of the "fraud" convictions is the question whether the existence of the carried interests was a material fact. The prosecution's position throughout has been that by failing to inform the purchasers of the existence of those interests, Puckett did not "state a material fact necessary in order to make the statements made, in the light of the circumstances under which they [were] made, not misleading." K.S.A. 1980 Supp. 17-1253(a)(2). Puckett's position is that the existence of the carried interests was not a material fact because the purchasers "bought in" on a turnkey basis—each purchaser got just what he bargained for, a specific fractional interest in the production, if any.

To avoid misunderstanding by some readers, it may be of worth to briefly comment on the term "carried interest." It is a technical term used in the oil industry. It appears it does not define any specific form of an agreement but rather serves merely as a guide in preparing and interpreting agreements. Apparently industry practice ordinarily calls for reimbursement to the carrying party first from future production, that is, the carried party does not share in the production until the carrying party has recouped his advances, although the terms of a carried interest are to be fixed by agreement. *Ashland Oil & Refining Company v. Beal,* 224 F.2d 731, 735 (5th Cir. 1955); *Byrd v. Smyth,* 590 S.W.2d 772, 775 (Tex. Civ. App. 1979); 38 Am. Jur. 2d, Gas and Oil § 179, p. 660; Williams & Meyers, Oil and Gas Law, Manual of Terms (1980 Supp.) p. 66; 2 Williams & Meyers, Oil and Gas Law § 424, pp. 437-439, § 424.1, p. 443 (1981). Under the evidence in this case, a purchaser was to recoup his investment only from the distributions to him for his share of production less operating costs.

The merit of the prosecution's case had at its foundation the circumstances of the sales. These necessarily and unquestionably included the fact the sales were turnkey, the linchpin of the defense. The materiality of the existence of the carried interests, an ultimate fact, and the jury decision of guilt or innocence hinged upon the interplay of carried interests and turnkey purchases.

To prove its case on the materiality question, the prosecution presented the expert testimony of two witnesses. Each testified the existence of a carried interest is a material fact for consideration in the purchase of the cost-burdened working interest under an oil and gas lease. Neither turnkey purchase of the totality of the cost-burdened working interest under a lease nor turnkey purchase of a fractional cost-burdened working interest under a lease was shown as having been considered in arriving at their opinion.

Defense counsel was denied cross-examination inquiry on the subject of turnkey purchase. The defense was not allowed to test the witnesses' opinions in the light of a fact pivotal to resolution of both ultimate fact and issue. In my view, this was an abuse of discretion by the trial judge that amounts to reversible error. Were it not for the expert testimony, defendant stands convicted on the testimony of disappointed investors who after the fact and as the product of inquiry by state officials reason their unsuccessful investment decisions were founded on nondisclosure in a subject matter area concerning which few, if any, of them had or even now have any knowledge. Even though *Ziegler v. Crofoot,* 213 Kan. 480, 486-488, 516 P.2d 954 (1973), approved admission of expert opinion testimony embracing an ultimate fact, I fail to see it or the circumstances of this case make it proper to insulate the experts' opinions from testing through cross-examination. Compare *Lollis v. Superior Sales Co.,* 224 Kan. 251, 260-63, 580 P.2d 423 (1978). Reversible error has been found on the ground cross-examination was unduly restricted. *Bourgeois v. State Highway Commission,* 179 Kan. 30, 34, 292 P.2d 683 (1956).

I would affirm the fourteen non-"fraud" convictions. I would reverse the seven "fraud" convictions because of undue restriction on the cross-examination of the prosecution's experts, and grant defendant a new trial on those charges.

While there is merit to the majority's criticism of the fraud instructions, I am not prepared to say it is our calling to reverse a trial court judgment, even in a criminal case, where we find a "clear error" that has not been raised by the appellant either at the trial level or on appeal. Except for that, I express no views with regard to the majority's treatment of other issues; nothing need be said or decided with respect to the other issues raised in challenge of the "fraud" convictions.

If defendant is tried again on the "fraud" charges, consideration should be given to revision of the instructions on the elements of the offense.